Dolores P. HAROLD, Widow of David D. Harold, Deceased

v.

The UNITED STATES.

No. 424–79.

United States Court of Claims.

Sept. 10, 1980.

John M. Gallagher, Jr., Media, Pa., for plaintiff; Alexander A. DiSanti, Media, Pa., attorney of record for plaintiff; Richard, Brian, DiSanti & Hamilton, Media, Pa., of counsel.

Benjamin F. Wilson, with whom was Asst. Atty. Gen. Alice Daniel and David I. Tevelin, Washington, D.C., of counsel.

Before COWEN, Senior Judge, and DAVIS and NICHOLS, Judges.

ON CROSS–MOTIONS FOR
SUMMARY JUDGMENT

COWEN, Senior Judge:

Plaintiff, the widow of David D. Harold, former Chief of the Aldan, Pennsylvania Police Department, sued here to recover a payment of $50,000, which she claims is due her by virtue of the Public Safety Officers' Benefit Act of 1976, Pub.L. 94–430, 90 Stat. 1346, codified as 42 U.S.C. § 3796, et seq. (1976).[1] Both parties have moved for summary judgment and there are no material facts in dispute. For the reasons stated herein, we hold that plaintiff is entitled to the claimed payment and accordingly grant her motion for summary judgment.

I.

The Public Safety Officers' Benefits Act of 1976 is neither a complex nor a lengthy statute. 42 U.S.C. § 3796 (1976) directs the Law Enforcement Assistance Administration (LEAA) to pay a $50,000 death benefit to the survivors of "a public safety officer [who] has died as the direct and proximate

1. 42 U.S.C. § 3796 provides in pertinent part as follows:

"§ 3796. Payment of death benefits
"(a) Amount; recipients

"In any case in which the Administration determines, under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Administration shall pay a benefit of $50,-000 as follows:

"(1) if there is no surviving child of such officer, to the surviving spouse of such officer; * * *."

result of a personal injury sustained in the line of duty * * *." Section 3796a of title 42, entitled "Limitations òn benefits," sets forth three specific situations in which no death benefit shall be paid.[2] 42 U.S.C. § 3796b defines certain terms used in the Act and the final section, 42 U.S.C. § 3796c grants LEAA the power, *inter alia*, to establish rules and regulations for the administration of the death benefit program established by the Act. Pursuant to this authority, LEAA has promulgated a regulation, codified as 28 C.F.R. § 32.2(c) (1979), which defines "line of duty" for purposes of section 3796. This regulation provides in pertinent part that:

> "Line of duty" means any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is obligated or authorized by rule, regulation, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which he is assigned, or for which he is compensated, by the public agency he serves. * * * [ 28 C.F.R. § 32.2(c) (1979)].

LEAA accompanied its promulgation of this regulation with the following commentary in the Federal Register:

> An officer is not acting within the line of duty when he is grossly negligent. See the dialogue between Congressmen Brown and Eilberg at Cong.Rec. H 10135–36 (Sept. 15, 1976, daily ed.). [42 Fed.Reg. 23259 (1977)].[3]

As will be seen, plaintiff's right to recover the contested benefits turns on whether the LEAA commentary is a valid interpretation of the statutory phrase "line of duty."

## II.

Plaintiff's husband, Chief Harold, died on February 4, 1977, as a result of an accidental, self–inflicted gunshot wound incurred on that date. Chief Harold was cleaning his police revolver in his home when it discharged. The weapon was fully loaded and the grips had been removed when the accident occurred. Shortly after her husband's death, plaintiff submitted to LEAA a claim for a section 3796 death benefit. In October 1978, the Director of the Public Safety Officers' Benefit Program ruled that plaintiff was not entitled to a death benefit because, in the director's opinion, Chief Harold's death did not occur in the line of duty as required by section 3796. The following two reasons were cited in support of the director's conclusion that Chief Harold's death did not occur in the line of duty:

(1) Chief Harold's death was not the result of a line of duty action, which he was obligated or authorized to perform while off duty.

(2) Chief Harold's death resulted from his gross negligence in the handling of his police revolver.

On October 30, 1978, plaintiff requested LEAA to reconsider the program director's decision. LEAA assented to this request and a hearing was held on plaintiff's claim on January 10, 1979. The hearing officer issued a decision on May 14, 1979, in which he affirmed the program director's determination that Chief Harold's death did not occur in the line of duty. The hearing officer based his affirmance solely on his finding that Chief Harold was grossly negligent in his handling of his weapon. He reasoned that by virtue of the commentary to section 32.2(c) of the regulations, the death was not sustained in the line of duty. He specifically rejected the other basis of the program director's initial determination, *i. e.*, that Chief Harold's death did not result from an action which he was required to perform while off duty. Rather, the hearing officer found that because of the small size of the Aldan police force "it was

---

2. For the text of section 3796a, *see infra.*

3. While the quoted commentary does not appear in the Code of Federal Regulations, defendant argues that the commentary has the same force and effect as a regulation which does appear in C.F.R. Plaintiff does not take issue with this argument and for purposes of this case, we will assume that the commentary has equal validity with a regulation which appears in C.F.R.

an unwritten rule of the police department that the policemen were to clean their weapons at home." Therefore, he concluded that in this sense, Chief Harold's death did occur in the line of duty.

Plaintiff appealed the decision of the hearing officer to the LEAA administrator, who, on August 10, 1979, affirmed the hearing officer's decision. Specifically, the administrator found that "but for the gross negligence in the handling of his weapon that resulted in his death, [Chief Harold's] action in cleaning his weapon at home while off duty would have been in the 'line of duty' * * *." Plaintiff then brought this suit.

### III.

Plaintiff concedes for purposes of this action that Chief Harold was grossly negligent in his handling of his police revolver. As a consequence, the sole issue here is the validity of the administrator's determination that Chief Harold's gross negligence placed his activities outside of the line of duty. Since the only cited basis for this determination was the commentary to section 32.2(c) of the regulations, we must decide whether this commentary comports with the meaning attached by Congress to the term "line of duty" when it enacted the Public Safety Officers' Benefits Act of 1976.

The starting point for any inquiry into the meaning of a statute is of course the language used by Congress in the statute. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978); *Ampex Corporation v. United States*, 223 Ct.Cl. ——, 620 F.2d 853, 857–858 (1980). Defendant does not dispute the fact that the Public Safety Officers' Benefits Act contains no provision which explicitly debars the payment of a death benefit to the survivors of a law enforcement officer when his death is caused by his own gross negligence. Indeed, to the extent that the language of the statute supports any speculation regarding the Congressional intent on this question, it suggests just the opposite.

In section 3796a Congress specifically delineated three sets of circumstances in which the payment of death benefits would be barred. Section 3796a provides:

No benefits shall be paid under this [Act]—

(1) if the death was caused by the intentional misconduct of the public safety officer or by such officer's intention to bring about his death;

(2) if voluntary intoxication of the public safety officer was the proximate cause of such officer's death; or

(3) to any person who would otherwise be entitled to a benefit under this subchapter if such person's actions were a substantial contributing factor to the death of the public safety officer.

Congress failed to make even an implicit reference to an officer's gross negligence in this list of disentitling circumstances when "it could easily have done so explicitly." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). This omission suggests to us that Congress did not intend an officer's gross negligence to preclude the payment of death benefits. *See Zuber v. Allen*, 396 U.S. 168, 185–87, 90 S.Ct. 314, 323–25, 24 L.Ed.2d 345 (1969).

Nevertheless, defendant argues that the failure of Congress to include an officer's gross negligence in the section 3796a list of disentitling circumstances is irrelevant, because Congress intended the term "line of duty" to be interpreted as excluding acts performed in a grossly negligent manner. The sole support cited by defendant for the view that Congress adopted the rule set out in LEAA's commentary is a colloquy among Representatives Brown of Michigan, Eilberg and Sarbanes, during the floor consideration of the conference report on H.R. 366, 94th Cong., 1st Sess. (1975), the bill which became the Public Safety Officers' Benefits Act of 1976. This colloquy addressed the question whether an officer whose death resulted from his own gross negligence would be covered by the Act.

The colloquy is reproduced in pertinent part below.[4]

While some of the quoted remarks can be viewed as corroborative of LEAA's interpretation of "line of duty," we think that the colloquy considered as a whole is ambiguous. At most, it casts a very hazy light upon the Congressional understanding of the term "line of duty." The ambiguity and resulting haziness are caused (1) by Mr. Eilberg's remark that there would be "no coverage" (*i. e.,* no death benefit) if a law enforcement officer's death resulted from either the officer's gross negligence or from his *negligence* ; and (2) by Congressman Brown's statement that the responses given him in the colloquy did not dispose of his question as to whether "line of duty" excluded "negligence." 122 Cong.Rec. 30520 (1976) (emphasis added).

In its brief, defendant takes the position that "undoubtedly" Congressman Eilberg was "of the belief that only gross negligence, and not mere negligence on the part of a public safety officer would preclude the officer's survivors from recovering benefits under the Act." Brief for defendant at 8. Why there is no doubt about this proposition is not explained. Because of the ambiguity of the colloquy and the fact that it is the only element of the legislative history which indicates that Congress intended to preclude death benefits for the beneficiaries of grossly negligent officers, we decline to give it the significance urged by defendant. *See Zuber v. Allen, supra,* 396 U.S. at 185–87, 90 S.Ct. at 323–25; *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,* 377 U.S. 58, 69–70, 84 S.Ct. 1063, 1069–70, 12 L.Ed.2d 129 (1964); *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 313–15, 76 S.Ct. 937, 942–43, 100 L.Ed. 1209 (1956); *Pennsylvania R.R. Co. v. International Coal Mining Co.,* 230 U.S. 184, 197–99, 33 S.Ct. 893, 896–

4. "Mr. BROWN of Michigan. * * * I take this time only to pose a question. * * * Am I correct that the benefit payable under this legislation would be payable even though the death occurred as a result of the gross negligence of the individual involved?

"Mr. EILBERG. * * * that is absolutely incorrect. If the individual involved is grossly negligent and that is the cause of his death, there would be no benefits that would flow to his next of kin.

"Mr. BROWN. * * * section 702 says as follows: 'No benefit shall be paid under this part—(1) if the death was caused by the intentional misconduct of the public safety officer or by such officer's intention to bring about his death; (2) if voluntary intoxication of the public safety officer was the proximate cause of such officer's death; or (3) to any person who would otherwise be entitled to a benefit under this part if such person's actions were a substantial contributing factor to the death of the public safety officer.' Are those not the only disentitling factors?

     *     *     *     *     *     *

"Mr. SARBANES. * * * before any payment can be considered, the person has to come within the limitation of having acted within the line of duty. A person grossly negligent in exercising his responsibility would fall outside of the umbrella of the act since his action was not within the line of duty, and therefore his next of kin would not be paid.

"Mr. BROWN. * * * is the gentleman telling me that if the person is within the geographic area of his employment, if he is working or acting during the hours of his employment, and he does things, even though negligently, within the scope of his employment, that he is not acting in the line of duty?

"Mr. SARBANES. I think the phrase 'line of duty' is a work of art. It is not defined precisely as the gentleman is defining it. However, that is correct. That is what I am saying to the gentleman from Michigan (Mr. Brown).

"Mr. BROWN * * * To establish the legislative history, is the gentleman saying, then, that negligent conduct in the line of duty precludes benefits? Is that right?

"Mr. EILBERG. * * * the term 'line of duty' I think is fully defined in the report, and I will read it at this point, for the purposes of legislative history. 'The term "line of duty," as used in the [Senate] bill—means that the officer's death must have occurred when the officer is performing duties authorized or required by law, acting in his official capacity as a law enforcement officer or fireman.'

"Mr. BROWN. * * * it says nothing about whether or not his death resulted because of his own negligence.

"Mr. EILBERG. * * * there would be no coverage in that case.

"Mr. WIGGINS. I think the legislative history is now clear.

"Mr. BROWN. * * * That may be so, but I think the language of the report should be in the law and whether in the report or in the law, I respectfully suggest it does not dispose of my questions in view of the response I have received." [122 Cong.Rec. 30520–21 (1976)].

97, 57 L.Ed. 1446 (1913). As Justice Frankfurter has so aptly phrased it:

A loose statement even by a chairman of a committee, made impromptu in the heat of debate, less informing in cold type than when heard on the floor, will hardly be accorded the weight of an encyclical. * * * [Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Col.L.Rev. 527, 543 (1947).]

What we find determinative, however, is that the colloquy is in conflict with other elements of the legislative history–elements which are both more revealing of the Congressional understanding of the term "line of duty" and also more probative of that understanding.

Although the bill which became the Public Safety Officers' Benefits Act was introduced in the House of Representatives, the term "line of duty" first appeared in the bill as a result of a Senate amendment. The version of H.R. 366 which passed the House of Representatives authorized a benefit for an officer who "died as the direct and proximate result of a personal injury sustained *in the performance of duty.*" H.R. Rep. No. 94–1032, 94th Cong., 2d Sess. 12 (1976) (emphasis added). After passage by the House, the bill was referred to the Senate Judiciary Committee. That Committee was already considering S. 2572, 94th Cong., 1st Sess. (1975), a bill similar to H.R. 366, sponsored by Senator McClellan. The Committee amended H.R. 366, by substituting the text of S. 2572 for the entirety of the House version. S.Rep. No. 94–816, 94th Cong., 2d Sess. 3 (1976), U.S.Code Cong. & Admin.News 1976, p. 2504. As part of this amendment, the term "line of duty" supplanted the term "performance of duty." The Senate report on H.R. 366, as amended, set out the following explanation of the new phrasing:

The term "line of duty" as used in this bill has the customary usage that the injury resulting in the officer's death must have occurred when the officer is performing duties authorized, required, or normally associated with the responsibilities of such officer acting in his official capacity as a law enforcement officer or fireman. [S.Rep.No.94–816, *supra*, at 6, U.S.Code Cong. & Admin.News 1976, p. 2507.]

Senator McClellan, the sponsor of the amendment, repeated this explanation from the committee report almost word–for–word during the Senate floor debate on H.R. 366.[5] After Senate passage of the amended bill, the conference committee adopted the Senate's substitution of the term "line of duty" for "performance of duty." The House conference report stated:

The Managers believe that "line of duty" is a well established concept and that it is appropriate to extend coverage to all acts performed by the public safety officer in the discharge of those duties which are required of him in his capacity as a law enforcement officer or as a fireman. [H.R.Rep.No.94–1501, 94th Cong., 2d Sess. 6 (1976)].

Two points are of particular importance with regard to these aspects of the legislative history. First, neither Senator McClellan in his floor remarks, nor the report of the Senate Judiciary Committee, mention gross negligence in discussing the meaning of "line of duty." While this silence is not, by itself, determinative of the issue, it does suggest that neither the sponsor of the amendment, nor the committee which reported the bill, believed an officer's gross negligence to be relevant to a determination of whether the officer was acting in the line of duty. *See Zuber v. Allen, supra,* 396 U.S. at 185, 90 S.Ct. at 323. It would have been a simple matter to include "gross negligence" in section 3796a as one of the circumstances in which payment of death benefits would be barred, or at least to allude to "gross negligence" in one of the committee reports in connection with the discussion of the term "line of duty."

**5.** "Line of duty, as used in this bill, is intended to mean that the injury resulting in the officer's death must have occurred when the officer was performing duties authorized, required, or nor- mally associated with the responsibilities of such officer acting in his official capacity as a law enforcement officer or a fireman." [122 Cong.Rec. 22634 (1976).]

Second, the Judiciary Committee report and the Conference Committee report show that Congress intended the term "line of duty" to be given its "customary" and "well established" usage. S.Rep.No.94–816, *supra*, at 6; H.R.Rep.No.94–1501, *supra*, at 6. While neither report explicitly states what that usage is, both reports concentrate on the nature of the activities being performed by the law enforcement officer at the time of his death. *Id.* Neither report alludes to the manner in which the acts leading to the officer's death were being performed. *Id.* This emphasis on the nature of the acts rather than the manner of their performance is consistent with the interpretation of the term "line of duty" as it has been used in a variety of pension acts for military personnel. *See e. g.* 7 Op.Att'y.Gen. 149, 162 (1855); 32 Op.Att'y.Gen. 12, 21–22 (1919); 32 Op.Att'y.Gen. 193 (1920).

The House report on H.R. 366 contains an additional reason for concluding that Congress understood the customary usage of the term "line of duty" as addressing only the nature and not the manner of performance. In discussing the tax status of the death benefits to be paid under the Act the report states:

> The Internal Revenue Service has advised the Committee that the benefit provided under the legislation "could be regarded as benefits received under a statute which is in the nature of [a] Workmen's Compensation Act and as such would be excludable under Section 104(a)(1) of the [Internal Revenue] Code." Therefore, such benefits shall not be subject to Federal income taxes. [H.R.Rep. No.94–1032, *supra*, at 5–6.]

It is a well accepted principle of the law of workmen's compensation that the manner in which a worker performs a task is not directly relevant to whether that task is within the scope of the worker's employment. 1A A. Larson, Workmen's Compensation Law §§ 31.21–.22 (1979). To the extent that this excerpt from the House

report indicates that Congress considered the Public Safety Officers' Benefits Act to be "in the nature of [a] Workmen's Compensation Act," it too supports a conclusion that Congress did not intend an officer's gross negligence to preclude the payment of a death benefit.

In sum, we conclude that the legislative history of the Act shows that Congress did not intend that the term "line of duty" should exclude instances in which the death of a safety officer is caused by his gross negligence in the performance of his duties. To the contrary, we think Congress recognized the distinction between the nature of the acts being performed at the time of an officer's death and the manner in which they were being performed, and that except for deaths due to intentional misconduct [6] and intoxication, Congress intended only the nature of the acts to be relevant to a determination of whether the death occurred in the line of duty. Therefore, we do not see how the LEAA commentary to section 32.2(c) of the regulation can be construed as anything but a contradiction of the Congressional understanding of the term "line of duty." As such, the commentary is entitled to very little weight in determining whether Chief Harold died in the line of duty. *See Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134–35, 56 S.Ct. 397, 399–400, 80 L.Ed. 528 (1936); *Lynch v. Tilden Produce Co.*, 265 U.S. 315, 320–22, 44 S.Ct. 488, 489, 490, 68 L.Ed. 1034 (1924). Since we find that Chief Harold's death occurred in the line of duty within the intended and generally accepted senses of that term, it follows that plaintiff is entitled to the claimed death benefit. Accordingly, plaintiff's motion for summary judgment is granted; defendant's motion is denied, and judgment is entered in favor of plaintiff in the sum of Fifty Thousand Dollars ($50,000).

DAVIS, Judge, concurring:

I join generally in the court's opinion but add these words because the problem of

---

**6.** It is undisputed that Chief Harold's death was accidental. Defendant does not contend that it resulted from his intentional misconduct. Furthermore, the terms "intentional misconduct" and "intentional wrong" are not equivalent to "gross negligence." *Bryan v. Jeffers*, 103 N.J. Super. 522, 248 A.2d 129 (1968).

legislative history in the case has given me a great deal of difficulty. On the one hand we have the comments of Representatives Eilberg and Sarbanes (important figures in the legislation) in the House debate, plus the fact that LEAA turned those views into a regulation. On the other hand, we have all the materials, including the statute's text, marshalled in the court's opinion. How to choose?

I assume, first of all, that in all probability Congressmen Eilberg and Sarbanes were quite deliberate when they said that gross negligence would bar coverage. It does not seem to me a slip of the tongue or an inadvertent phrasing (except perhaps for the mixing up of gross negligence and negligence). Nevertheless I agree with the court that these comments are outweighed. First, this floor conversation took place in the House debate, just before acceptance of the conference committee report, and was not reflected in any of the committee reports. Second, there is no indication that the Senate knew or accepted this belated version of the bill's meaning (*see* my concurring opinion in *Alyeska Pipeline Service Co. v. United States* 224 Ct.Cl. ——, 624 F.2d 1005 (1980)). Third, the Senate materials do not suggest in any way that gross negligence was excluded from "line of duty" if the officer was otherwise acting within his line of duty. Fourth, the text of the statute and the other authoritative House materials (aside from the Eilberg–Sarbanes comments) do not suggest the exclusion of gross negligence from "line of duty," but rather the opposite (especially the comparison to military "line of duty" and worker's compensation). Fifth, there was no agreement in the House that the Eilberg–Sarbanes colloquy settled the meaning of the law; Congressman Wiggins seemed to think it did while Congressman Brown appeared dissatisfied. In the end, I conclude with the court that this last–minute, single House attempt to construe the bill cannot prevail against the other indicia of congressional intent, including the precise words of the statute and the committee reports. Contrast my dissent in *Hart v. United States*, 218 Ct.Cl. 212, 585 F.2d 1025 (1978).

NICHOLS, Judge, concurring:

I concur in the court's opinion which well supports the conclusion we reach, as far as it goes, but I would go further. I also concur in Judge Davis' separate remarks. The colloquy quoted in the court's fn. 4 is an obvious instance of "planted" legislative history. By this I mean its purpose rather obviously was not to explain the bill to other Congressmen in order to enlist their support or opposition, but to talk over their heads to the LEAA and to us. As legislative deliberations have become more complex, the practice has grown up to try to fix up by legislative history any defect perceived at a time when it may be too late to fix it by the obvious means of amending the bill, without causing delay. This may be all right when the purpose of the planted history is to resolve an ambiguity, as, *e. g.*, the proper antecedent of a pronoun. It is all wrong when the intent is to supply an omitted case or contradict plain language. The present amendment by legislative history is either one or the other, most likely the former. It adds a fourth exception to the otherwise complete coverage (really a fifth). To (1)a intentional misconduct, (1)b suicide, (2) voluntary intoxication, (3) substantial contribution to causing the officer's death by the beneficiary, a (4) is in effect added, gross negligence of the deceased. It is therefore an attempt to insert statutory language neither House has voted on, nor has the language gone before the President for his signature or veto. Whatever constitutional objections exist to the one–House veto exist in spades to this practice. The one–House veto at least is always aboveboard. What we know of planted legislative history, whether in floor debate or in committee reports, leaves us in doubt whether any particular instance is aboveboard or not, and without passing on this instance, frequently it may not be.

Here, the reference to "legislative history" by Mr. Wiggins is a dead give away, and the sour note sounded by Mr. Brown at the end destroys the otherwise beautiful

harmony. Our decision still should not be construed as admitting that a planted history constructed with more artistic verisimilitude would have achieved its purpose, though I am afraid that must often occur in fact. The decisive issue should be whether the asserted interpretation is one appropriate to accomplish other than by amending the bill. Whatever else a planted history may *de facto* achieve, it should not be allowed to hoodwink simple characters out in the boondocks who still suppose they can ascertain what Congress intends by procuring and reading the statutes.