Maria and Nicolas **DEMUTIIS**, Plaintiffs,

v.

The **UNITED STATES**, Defendant.

No. 99–243C.

United States Court of Federal Claims.

Oct. 23, 2000.

John Tynan, Worth, Longworth, Bamundo & London, New York City, attorney of record for plaintiff.

Elizabeth W. Newsom, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION AND ORDER

ALLEGRA, Judge.

Nicholas R. Demutiis, a New York City police officer, was off duty, but en route to his precinct, when the car he was driving was broadsided by a vehicle being chased, at a high rate of speed, by two patrol cars. Officer Demutiis died as a result of this crash. His family seeks compensation under the Public Safety Officers' Benefits Act (PSOBA or the Act), 42 U.S.C. §§ 3796–3796c (1994), which provides benefits to survivors of safety officers killed in the "line of duty." They claim that the fatal collision occurred while Officer Demutiis was assisting his fellow officers by obstructing the path of the fleeing vehicle. The Bureau of Justice Assistance (BJA) of the United States Department of

Justice, however, concluded that Officer Demutiis' death was not in the "line of duty," but rather the result of an unfortunate accident. On cross motions for summary judgment,[1] this court reverses the determination of BJA and remands this matter to the agency for further proceedings.

## I. Facts

On January 24, 1994, at approximately 11:06 p.m., Officer Nicholas R. Demutiis was off duty and driving to his assignment at the 106th Precinct in his personal vehicle. As he entered the intersection of Liberty Avenue and 102nd Street, in the borough of Queens, with a green light, he was fatally injured when his vehicle was struck by another vehicle, which entered the intersection against the red light. This vehicle was stolen and fleeing police from the 106th Precinct. Officer Demutiis' death was caused by injuries resulting from the crash. Three civilians witnessed the accident and made statements to detectives from the NYPD. All three concurred that the fleeing vehicle was traveling at a very high rate of speed, seventy to ninety miles per hour, with its lights off in the darkness. Two of the eyewitnesses reported that, prior to the impact, Officer Demutiis' vehicle was going "slow"; the third stated that Officer Demutiis' vehicle was "not going very fast." Additional reports were filed by the police officers who had been pursuing the vehicle that collided with Officer Demutiis' car.

On January 25, 1994, the City of New York issued a medical certificate of death, stating that Officer Demutiis' fatal injury occurred when he was struck by another vehicle being pursued by other police officers. That same day, the New York City Police Department (NYPD) issued a report, finding that the "collision occurred while Office Demutiis was apparently attempting to assist the On-duty members involved." The report stated that Officer Demutiis had died in the line of duty, concluding that "Police Officer Demutiis who

---

1. Although plaintiffs did not file a formal cross-motion, their response to defendant's motion seeks remand of this matter to the agency and defendant's reply addresses this point. Accordingly, the court treats plaintiffs' filing as essentially a cross-motion for summary judgment. *See Howard v. United States,* 42 Fed.Cl. 730, 731 (1999); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed.1998).

was travelling [sic] North on 102nd Street entered the intersection and appeared to slow down in an apparent attempt to assist the On–Duty officers in apprehending the suspect vehicle." These findings were confirmed in a memorandum dated January 25, 1994, from the Duty Captain of Queens Borough to the NYPD Chief of Patrol. Subsequently, the Medical Board Police Pension Fund found that "[t]here is sufficient clinical and medical documentary evidence to substantiate that Officer Demutiis sustained fatal injury while in the performance of his duty and therefore, recommendation is made that the widow's request for line of duty death designation for Accidental Death Benefits be approved." The State of New York provided worker's compensation benefits to Officer Demutiis' survivors, his wife, Maria, and son, Nicolas.

In February 1994, Maria and Nicolas Demutiis submitted a claim to the BJA for benefits under the PSOBA. After requesting and receiving additional information, including photographs of the accident scene, on April 8, 1995, the Public Safety Officers' Benefits Program Office issued an Initial Determination, finding that the claim did not meet the requirements of the Act. The determination concluded that Officer Demutiis was off duty and driving his personal vehicle at the time of the accident and that the evidence did not demonstrate that he was responding to a specific emergency at the time of the accident.[2] The Program Office also decided that photographs showed that buildings likely blocked his view and made it doubtful that he had any time to see the oncoming vehicle until immediately before impact. The Program Office concluded that Officer Demutiis was the victim of an accident and that his family thus did not qualify for benefits.

Mrs. Demutiis appealed the Program Office's decision on April 20, 1995, and requested a hearing. On September 15, 1995, an evidentiary hearing was held before Hearing Officer Anthony Pearsall, who reviewed evidence presented by Mrs. Demutiis' attorney,

including the photographs and reports from the NYPD, and heard testimony from four NYPD officers, as well as Mrs. Demutiis. The testimony of the police officers may fairly be summarized as follows:

— Officer John Knapp, who was in the patrol unit closest to the fleeing vehicle, testified that the station house was visible from the location of the accident, approximately 100 to 150 feet away. He also stated that a police officer would be expected to take action before his or her tour commenced if something occurred in such proximity to the station house. Officer Knapp was chasing the stolen vehicle, with his unit's emergency lights and siren on, when he saw Officer Demutiis' car pull out into the intersection. He testified that Officer Demutiis would have been able to hear his siren. Officer Knapp saw Officer Demutiis stop his car in the intersection in what appeared to be an attempt to stop the car being chased.

— Officer Michael Banks, Officer Knapp's partner, testified that Officer Demutiis would have been able to hear the siren due to a sort of tunnel created by the buildings that lined the streets and the train platform above. Officer Banks stated that Officer Demutiis slowed down and came to a stop in the intersection as the stolen car entered the intersection. He testified that Officer Demutiis had the opportunity to escape the accident, but did not, remaining in the intersection, in Officer Bank's view, to attempt to help his fellow officers.

— Officer Louis Corrente, who was in the unit following Officers Knapp and Banks, stated that the picture showing the intersection of the accident did not accurately represent the view Officer Demutiis had because the building line was set back in a way not illustrated

---

**2.** In determining whether the family of an off-duty officer on the way to or from work is eligible for death benefits, the BJA looks at three factors: (i) whether the officer was driving his employer's vehicle; (ii) whether the officer was responding to a specific emergency; or (iii) whether the officer is required by his employer to use his personal vehicle at work. *See* discussion *infra* in note 17.

by the picture. Office Corrente did not actually see the impact, but testified that Officer Demutiis had a clear view down Liberty Avenue. He also stated that his vehicle's emergency lights were on and his siren was intermittently on, but probably off, as he approached the intersection of Liberty and 102nd Street.

— Officer William Emburey arrived at the scene approximately two minutes after the accident and testified that Officer Demutiis typically went out of his way for other police officers. He also stated that while there are no specific written guidelines for what an off duty police officer is required to do, action may be taken against an officer for failure to take proper police action, even when off duty.

Following the evidentiary hearing, Mrs. Demutiis' attorney submitted a letter further supporting her position, but did not provide any additional factual information.

On December 6, 1995, Hearing Officer Pearsall issued a determination concluding that the evidence did not establish that Officer Demutiis was acting in the line of duty at the time of his death. He noted that the testimony of the police officers "was largely speculative in nature," asserting that they "characterized the actions of Officer Demutiis based on their beliefs of what they surmised his actions to be." He found that the police officers' testimony "significantly" differed from the statements of the citizen eyewitnesses, that Officer Demutiis' vehicle lacked a police radio, and that there was no objective evidence that Officer Demutiis knew the circumstances surrounding the fleeing vehicle. While noting that the State of New York had awarded worker's compensation benefits, the hearing officer concluded that this ruling was "not relevant" because the state's standards for worker's compensation "may" allow a broader interpretation of

compensability than the PSOBA. In March of 1996, the Office of the General Counsel of the Department of Justice's Office of Justice Programs reviewed the appeal file and found that the hearing officer's determination was consistent with the terms of the PSOBA and its implementing regulations.

Mrs. Demutiis submitted a memorandum, dated April 11, 1996, in opposition to the hearing officer's determination, requesting the review thereof by the Director of the BJA. This memorandum highlighted aspects of the hearing officer's decision with which Mrs. Demutiis disagreed and argued that a "jaundiced pre-disposition prevailed throughout the hearing." In December of 1996, the Director, after reviewing the record, found the hearing officer's determination to be consistent with the applicable law, stating that "sufficient evidence" was not provided to demonstrate that Officer Demutiis was acting in the line of duty.

On April 26, 1999, Mrs. Demutiis brought action in this court, seeking review of the final agency determination. Defendant filed a Motion for Judgment upon the Administrative Record on December 23, 1999. Following the transfer of this case to the undersigned judge, oral argument was heard on September 25, 2000.

## II. Discussion

### A. The PSOBA

The Public Safety Officers' Benefits Act of 1976 is "neither a complex nor a lengthy statute." *Harold v. United States*, 225 Ct.Cl. 168, 634 F.2d 547, 547 (1980). Section 3796(a) of the PSOBA provides for the payment of a $100,000 death benefit to the survivors of a public safety officer who dies as a direct and proximate result of injuries sustained in the "line of duty." 42 U.S.C. § 3796 (1994).[3] Recognizing the extraordinary risks incurred by officers in serving the public, Congress provided for these death

**3.** Pursuant to statutory direction, the BJA has promulgated regulations construing the Act. *See* 42 U.S.C. § 3796(a); 28 C.F.R. § 32.1–.40 (1999). According to one of these provisions, "line of duty" means "[a]ny action which an officer whose primary function is crime control or reduction, [or] enforcement of the criminal law ... is obligated or authorized by rule, regulations, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which the officer is assigned, or for which the officer is compensated, by the public agency he serves." 28 C.F.R. § 32.2(c)(1).

benefits not only as a matter of equity, but also to promote the recruitment and retention of safety officers as part of the national fight against crime. In this regard, the Senate Report accompanying the enactment explains:

> The motivation for this legislation is obvious: The physical risks to public safety officers are great; the financial and fringe benefits are not usually generous; and the officers are generally young with growing families and heavy financial commitments. The economic and emotional burden placed on the survivors of a deceased public safety officer is often very heavy.... [T]o provide the assurance of a Federal death benefit to his survivors is a very minor recognition of the value our government places on the work of this dedicated group of public servants.

S.Rep. No. 94–816, at 3–4 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2504, 2505. *See also Russell v. Law Enforcement Assistance Administration,* 637 F.2d 1255, 1261 (9th Cir. 1980). In similar fashion, the House Judiciary Committee characterized an earlier version of the legislation as a "recognition of society's moral obligation to compensate the families of those individuals who daily risk their lives to preserve peace and to protect our lives and property." H. Rep. No. 94–1032, at 3 (1976).[4]

This legislative history is an important extrinsic aid in determining how the PSOBA should be interpreted and applied. *See Russell,* 637 F.2d at 1261. It has long been a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). *See also Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 684, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (remedial statute should be "liberally and beneficently construed"); 3 N. Singer, Sutherland Statutory Construction § 60.01 (5th ed.1992). This canon frequently has been applied in interpreting Federal statutes con-

ferring benefits and rights on employees. *See Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) (Federal Employers' Liability Act); *Corning Glass Works v. Brennan,* 417 U.S. 188, 208, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (Equal Pay Act); *Haberman v. Finch,* 418 F.2d 664, 667 (2d Cir.1969) (Social Security Act). *See also Forshey v. Gober,* 226 F.3d 1299, 1303 (Fed.Cir.2000) (applying same rule to veterans' benefits statute). The PSOBA is likewise remedial in nature and thus should not be applied grudgingly, but rather should be construed liberally to avoid frustration of its beneficial legislative purposes. Consistent with this approach, the regulations implementing this statute pronounce that "[t]he Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death or permanent and total disability in favor of payment of the death or disability benefit." 28 C.F.R. § 32.4 (1999). *See Davis v. United States,* 46 Fed. Cl. 421, 427 (2000).

**B. Standard of Review**

Motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. *See* RCFC 56.1(a); *Hoskins v. United States,* 40 Fed.Cl. 259, 270 (1998). Summary judgment is an integral part of the federal rules; it is designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 In reviewing an administrative denial of benefits under the PSOBA, this court

---

**4.** *See also* 122 Cong. Rec. 12,002 (1976) (remarks of Rep. Eilberg) (the payment the bill authorizes is "certainly the least our society can do to meet its moral obligation to provide care for such individuals"); 122 Cong. Rec. 12,004

(1976) (remarks of Rep. Drinan) ("the fact of the matter is that society and the Federal Government have a special obligation toward those who assume the risk of a violent death in order to protect the safety and peace of society").

must confine itself to the administrative record created in the proceedings below. *City of Wheeling, W.Va. v. United States,* 20 Cl. Ct. 659, 666 (1990), *aff'd without opinion,* 928 F.2d 410 (Fed.Cir.1991); *Durco v. United States,* 14 Cl.Ct. 424, 427 (1988). Such review is limited to determining: "(1) whether there has been substantial compliance with statutory and implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the Government officials involved; and (3) whether there was substantial evidence supporting the decision." *Morrow v. United States,* 227 Ct.Cl. 290, 647 F.2d 1099, 1102 (1981), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981). *See also Davis v. United States,* 46 Fed.Cl. at 423–24; *Chacon v. United States,* 32 Fed.Cl. 684, 687 (1995), *aff'd,* 48 F.3d 508 (Fed.Cir.1995). The court should neither act like a "superagency" nor make a redetermination of the merits based upon the administrative record. *See Holman v. United States,* 181 Ct.Cl. 1, 383 F.2d 411, 415 (1967); *Durco v. United States,* 14 Cl.Ct. at 427–28. At the same time, the Supreme Court has cautioned that a reviewing tribunal cannot permit itself to "slip into a judicial inertia" or mechanistically "rubberstamp" the agency. *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.,* 464 U.S. 89, 97, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983) (quotations omitted).

■■■ The various standards of review applicable here warrant a few more words of elaboration. Regarding the "arbitrary and capricious" standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994), the Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the

ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted).[5] By its very definition, this standard requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The Supreme Court burnished these twin requirements in *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based. The Court stated:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. 2856. *See also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

The court must also determine whether the agency's decision here is supported by "substantial evidence." Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Durco v. United States,* 14 Cl.Ct. at 428. While less than the weight or preponderance of the evidence, *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), substantial evidence is "more than a scintilla" that would "create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660

---

5. *See also Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000); *Blount, Inc. v. United States,* 22 Cl.Ct. 221, 227 (1990).

(1939). Such evidence has been characterized as "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Id.* at 300, 59 S.Ct. 501.[6] It follows, *a fortiori*, that if the agency's result is reasonable, a court "may [not] displace ... [the] choice between two fairly conflicting views, even though the court would justifiably have made a difference choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In other words, "[t]he question under [this standard] is whether the evidence is such that a reasonable person, acting reasonably, could have reached the decision from the evidence and the inferences." Bernard Schwarz, Administrative Law § 10.8 (2d ed.1984). *See also* 2 Alan Childress & Martha S. Davis, Standards of Review § 15.04 (3d ed.1999).

Guided by these principles, the court now turns to the parties' contentions.

## C. Were the Actions of the BJA Arbitrary, Capricious or Contrary to Law?

Plaintiffs argue that the BJA, and, particularly, the hearing officer, acted "contrary to law" in failing to give proper effect to the agency's PSOBA regulations in at least three significant regards: First, they assert that the agency failed to observe that portion of its regulations requiring it to resolve "any reasonable doubt" in favor of the payment of benefits. Second, plaintiffs assert that the agency violated legislative intent and the agency's regulations in holding that the determinations, made by state and local agencies, that Officer Demutiis was acting in the "line of duty" at the time of his death were irrelevant. Finally, plaintiffs complain that the hearing officer failed to conduct the hearing in a fashion "best designed to ascertain the rights of the claimant," as required by the BJA's regulations. These errors, plain-

tiffs assert, in combination, caused the agency to conclude improperly that Officer Demutiis' death did not occur in the "line of duty." The court will consider these allegations seriatim.

### 1. Reasonable Doubt

As noted above, the regulations governing the application of PSOBA provide that "[t]he Bureau [of Justice Assistance] shall resolve any reasonable doubt arising from the circumstances of the officer's death or permanent and total disability in favor of payment of the death or disability benefit." 28 C.F.R. § 32.4. Commenting on the application of this regulation to the instant case, the hearing officer stated "this is not a case where reasonable doubt applies. Rather, it is a case where the weight of evidence supports denial of benefits under the PSOB Act." This statement, and the manner in which the hearing officer resolved various factual issues, *see infra* Part D, reflect the hearing officer's apparent belief that the "reasonable doubt" regulation does not apply to subsidiary fact findings, but rather applies only where the evidence, as a whole, is essentially balanced and thus neither supports not refutes the provision of benefits. Counsel for defendant, indeed, essentially made this assertion at oral argument, citing, in support thereof, this court's decision in *Tafoya v. United States,* 8 Cl.Ct. 256, 262–63 (1985).

█ To be sure, this court must afford an agency considerable discretion in applying its own regulations. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("[w]e must give substantial deference to an agency's interpretations of its own regulations").[7] Here, however, the hearing officer did not comply with the plain terms of the "reasonable doubt" regulation, but instead adopted a myopic view of that regulation which deprived it of any vitality. This interpretation was erroneous for several reasons.

---

**6.** The Supreme Court has adhered to this formulation on numerous occasions. *See, e.g., American Textile Mfrs. v. Donovan,* 452 U.S. 490, 522, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

**7.** *Compare NLRB v. Brown,* 380 U.S. 278, 291–92, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) (reviewing courts must not "rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute").

First, nothing in the terms of the regulation suggests that it applies only to the ultimate issue whether a claimant qualifies. *Per contra.* The term "any," which modifies the phrase "reasonable doubt" in the regulation, ordinarily is construed comprehensively to mean "all" or "every,"[8] thereby suggesting the agency may need to resolve more than one reasonable doubt in a particular case, a result that is irreconcilable with defendant's view of the regulation. *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (agency interpretation of its regulation not controlling if "plainly erroneous or inconsistent with the regulation"); *Honeywell, Inc. v. United States*, 228 Ct.Cl. 591, 661 F.2d 182, 186 (1981) (same). Second, construing the regulation in defendant's terms would lead to an application of the PSOBA that would be contrary to legislative intent, as well as the above-described canons of construction designed to effectuate that intent, both of which

compel a conclusion that Congress desired this statute to be applied liberally.[9] Finally, construing the regulation in the fashion that defendant contends would essentially render it a nullity, limiting its applications to those rare situations where the record evidence on the ultimate question of eligibility is in equipoise. Such a disemboweling construction of a regulation is disfavored[10] and runs counter to the legal maxim *lex non patitur absurdum, i.e.,* the law does not suffer an absurdity. Rather, the only reasonable construction of the regulation consistent with the foregoing principles is that it applies not only to the ultimate conclusion of eligibility, but also to subsidiary fact findings.

Neither *Tafoya* nor any other case suggests to the contrary. In *Tafoya*, this court stated that "[w]here there is no reasonable doubt concerning an issue, plaintiff is not entitled to the benefit of section 32.4." 8 Cl.Ct. at 264.[11] More recently, the Federal Circuit similarly observed that "[w]here a

---

**8.** "The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed.Cir.1997) (citations omitted). *See also United States v. Rosenwasser*, 323 U.S. 360, 362–63, 65 S.Ct. 295, 89 L.Ed. 301, (1945) ("any" employee means all employees under the Fair Labor Standards Act, unless specifically excluded); *Bollman Hat Co. v. Root*, 112 F.3d 113, 116–17 (3d Cir.1997), *reh'g denied, cert. denied*, 522 U.S. 952, 118 S.Ct. 373, 139 L.Ed.2d 290 (1997) (holding the words "any" and "all" both mean "the whole of" or "every" in ERISA plan); *Kalmbach, Inc. v. Insurance Co. of the State of Pa., Inc.*, 529 F.2d 552, 556 (9th Cir.1976) ("[T]he word 'any' has a comprehensive meaning and has been judicially defined to mean 'all or every.' The common understanding of the word is that it means all or every.") (citations omitted*); Talton v. Behncke*, 199 F.2d 471, 474 (7th Cir.1952) (finding the word "any" to be all inclusive, without limitation or restriction, and equivalent to "all" and "every").

**9.** *See Foothill Presbyterian Hosp. v. Shalala*, 152 F.3d 1132, 1134 (9th Cir.1998) ("In reviewing an administrative agency's construction of a statute or regulations, we must reject constructions that are contrary to clear congressional intent or that frustrate the policy that Congress sought to implement"). *See also Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See generally,* Melanie E. Walker, *Congressional Intent and Deference to Agency Interpretations of Regulations,* 66 U. Chi. L.Rev. 1341 (1999).

**10.** *See Cammarano v. United States*, 358 U.S. 498, 505, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959) (rejecting construction of regulation that would render a phrase "pure surplusage"); *Kauffman v. Puerto Rico Tel. Co.*, 841 F.2d 1169, 1175 (1st Cir.1988) (rejecting proffered construction of the regulation that would render it without any force or effect and run counter to the objectives of the act under which it was promulgated). In an unrelated context, a former government official has described the odds of evidence in a case being in equipoise as "like the odds of flipping a coin and having it land on its edge." *See Internal Revenue Service Restructuring and Oversight Hearings Before the Senate Finance Comm.,* 105th Cong. 282, 285 (1998) (statement of Fred T. Goldberg, Jr.).

**11.** This case is plainly distinguishable from *Tafoya*. In that case, Officer Tafoya was voluntarily intoxicated at the time of his death and there were no eyewitnesses to the shooting or concrete evidence as to what occurred. 8 Cl.Ct. at 258–59. Instead, a likely scenario was developed by the police, based solely on the experience of the investigation team and without virtually any facts relating to why the officer was killed and who shot him. *Id.* at 262. In the present case, Officer Demutiis' death was confirmed by both concrete evidence and eyewitnesses. Thus, the reasoning which led the *Tafoya* court to conclude that the plaintiff was not entitled to the benefit of the "reasonable doubt" regulation is inapposite here.

claimant does not even make a prima facie showing of a traumatic injury, there cannot be any reasonable doubt to which the claimant is entitled." *Greeley v. United States,* 50 F.3d 1009, 1012 (Fed.Cir.1995). *See also Howard v. United States,* 229 Ct.Cl. 507, 510, 1981 WL 22040 (1981) ("reasonable doubt" standard did not come into play "because here there is no reasonable doubt to be entertained"); *Morrow,* 647 F.2d at 1103 (regulation inapplicable because "no reasonable doubt" as to cause of death). Far from rejecting the foregoing analysis, the language in these decisions actually is supportive in suggesting that the "reasonable doubt" standard should be applied, at very least, on an issue by issue basis. Moreover, while these cases declared that the regulation holds no sway where there is "no reasonable doubt" or plaintiff has failed to "make a prima facie showing," such is not the case here. Rather, plaintiffs presented significant evidence supporting their claim, including testimony from two police officers, who each testified, based on personal observation, that Office Demutiis took specific actions that were consistent with an objective to obstruct the fleeing vehicle. In these circumstances, the hearing officer erred in failing to apply properly the "reasonable doubt" regulation in deciding whether Officer Demutiis acted in the "line of duty."

A correct application of the "reasonable doubt" regulation may prove determinative on remand because, *inter alia,* the hearing officer appeared to proceed on the notion that plaintiffs had to prove not only that Officer Demutiis acted in a fashion consistent with assisting the officers, but also that he subjectively intended to accomplish that result. It is far from clear that such a demonstration of intent is required.[12] Nonetheless,

in the court's view, if, on remand, the agency determines that Officer Demutiis' action were of a nature that, depending upon his intent, either could or could not be consistent with acting in the line of duty, then, under the "reasonable doubt" regulation, the agency would be compelled to conclude that his actions were intended to assist his fellow officers.

**2. Weight Entitled Local Agency Findings and Conclusions**

■ In the instant case, the NYPD con-. cluded that Officer Demutiis was acting in the "line of duty" when he was killed. In the report that accompanied the latter decision, Officer Demutiis' patrol supervisor, a police lieutenant, reported that:

> [T]he above member of the service was enroute to the 106 precinct S.H. to perform a 2315–0750. Upon coming to the intersection at 102 Street and Liberty Avenue the officer observed a vehicle fleeing from a marked [patrol car] and apparently in an attempt to prevent the vehicle from escaping, blocked the intersection with his vehicle and was struck broadside and killed.

A second police lieutenant, supervising the "line of duty" determination, reviewed this finding and concluded:

> Based on interview of witnessing officers as well as personal observations made at the scene it is the conclusion of the undersigned that Officer Demutiis while of [sic] duty was coming to the aid of on duty members of the service when he was struck and killed.

This conclusion was then approved by a police captain and a deputy inspector,[13] and

---

12. In *Davis v. United States,* 46 Fed.Cl. 421 (2000), this court held, in determining whether his actions were in the "line of duty," that it was irrelevant whether the officer there intended to assist in the apprehension of an alleged perpetrator, stating:

> Whether or not Officer Davis's actions (actions which did in fact result in the apprehension of Robert Knowles) were purposeful or intentional is irrelevant to a determination of whether Officer Davis was acting "in the line of duty." To find otherwise requires an interpretation of the PSOBA that is inconsistent with the text of

the statute, the legislative history and the agency's own regulations.

46 Fed.Cl. at 427. *See also Tafoya,* 8 Cl.Ct. at 262 ("The proper focus in determining whether an officer is acting in the line of duty is on the nature of the acts being performed by the officer at the time of his death").

13. A January 25, 1994 memorandum from the Duty Captain, Patrol Borough Queens to the Chief of Patrol provided further details of the investigation of Officer Demutiis' death. In critical part, this memorandum indicated that the

forwarded to the Board of Trustees of the Police Pension Fund, which, in turn, approved a Line of Duty Death Designation for Officer Demutiis. Subsequently, the State of New York relied on the "line of duty" report in concluding that Office Demutiis' family was entitled to worker's compensation benefits.

With respect to the findings of state and local agencies, BJA's regulations under the PSOBA provide that "[t]he Bureau will give substantial weight to the evidence and findings of fact presented by State, local, and Federal administrative and investigative agencies." 28 C.F.R. § 32.5 (1999). In the instant case, however, the hearing officer did not give the findings of fact presented by the NYPD and the State of New York "substantial weight," but instead made short shrift of them, concluding:

> The fact that the State of New York provided worker's compensation benefits to the survivors of Officer Demutiis is not relevant in this matter. The standard applied in making such a determination under New York State law may allow for a broader interpretation of compensability than is allowed under the PSOB Act. The determination of this claim is solely governed by the provisions of the PSOB Act and its regulations.

investigation showed that "Police Officer Demutiis who was travelling [sic] North on 102nd Street entered the intersection and appeared to slow down in an apparent attempt to assist the On–Duty officers in apprehending the suspect vehicle."

14. The bulletin, entitled "Civil Liability of Police Officers," only indirectly dealt with the situation of this case, focusing instead on the potential civil liability of off-duty officers making arrests and conducting other police activities. The hearing officer heavily relied on the portion of the bulletin that stated that an off-duty officer is not "required ... to enforce minor offenses such as traffic infractions." The hearing officer assumed, without any further support in the bulletin or the administrative record, that the individual in question, who was fleeing two patrol cars at 80 miles an hour with his lights off, was properly viewed as having committed only such a "minor offense." More critically, nothing in the bulletin supports the hearing officer's conclusion that Officer Demutiis was *not authorized* to attempt to stop this individual. To the contrary,

A review of the hearing officer's determination, in fact, reveals several other instances in which he failed to attach any weight to the fact findings of the city officials. For example, he failed to even discuss those findings while rejecting, out of hand, the oral testimony provided by the police officers—testimony that, of course, was entirely consistent with the city's findings. The hearing officer also disregarded these findings in deriving a novel interpretation of a NYPD Bulletin and concluding, based thereupon, that under "internal police policy, Officer Demutiis would not have been undertaking appropriate action even if evidence supported the assertion that he used his car to block a fleeing vehicle or to otherwise assist police." This conclusion is not only inconsistent with the bulletin itself,[14] but, of course, also entirely incongruous with the official findings rendered in this case by the same police department, the NYPD, that developed and issued the bulletin.

Thus, the hearing officer's statements, observations, and conclusion all demonstrate that he gave no weight to the fact findings rendered here by state and local officials. To be sure, the fact that the local officials concluded that Officer Demutiis acted in the "line of duty" is not, in and of itself, determinative. In this regard, the PSOBA states: "In making determinations under section

the bulletin indicates that an off-duty officer may make an arrest when: "a) [t]he arresting officer is not personally involved in the incident; and b) [t]here is an immediate need for the prevention of a crime or apprehension of a suspect; and c) [t]he offense is a crime (felony or misdemeanor); and d) [t]he arresting officer is armed." For its part, defendant asserts that no evidence has been provided showing that Officer Demutiis was specifically authorized to use his personal vehicle to obstruct the fleeing car. Officer Banks' testimony on this count, however, is particularly telling:

> I'd like to just say something. You said before about us being trained as far as like blocking a vehicle and stuff like that. There's certain things you can't be trained for and sometimes we get medals for doing things we are not trained for, if you take some kind of action. Nobody's going to train you to jump in front of a bullet or save a hostage or whatever you are going to do, and you might get a medal for that. You're not going to be in trouble just because it is not in the patrol guide that says you must jump in front of a bullet. I think this situation is that same exact type situation ....

3796 of this title, the Bureau may utilize such administrative and investigative assistance as may be available from State and local agencies. Responsibility for making final determinations shall rest with the Bureau." 42 U.S.C. § 3796c(b). *See also Chacon,* 32 Fed. Cl. at 687. But, under the BJA's regulations, the fact findings rendered by the state and local agencies in reaching these conclusions are entitled to substantial weight, and the hearing officer acted contrary to those regulations in failing to give these findings any weight.

■ Moreover, the court finds that the hearing officer also erred in determining that the conclusions of the state and local compensation agencies were "irrelevant." This court's predecessor, in fact, has ruled that worker's compensation law is relevant in ascertaining whether an officer was acting in the "line of duty." Thus, in *Harold v. United States,* 225 Ct.Cl. 168, 634 F.2d 547 (1980),

the Court of Claims held that the fact that the police officer died as the result of his own negligence did not preclude a finding that he died within the "line of duty" within the meaning of the PSOBA. Carefully reviewing the legislative history undergirding the phrase "line of duty," the court noted that Congress had intended this phrase to be given its "customary" and "well established" usage.[15] It further found that one indication of such usage was "the law of workmen's compensation," which the court viewed as supporting its holding. *Harold,* 634 F.2d at 552. Contrary to defendant's claims, the *Harold* decision not only is binding on this court,[16] but is quintessential precedent in the case *sub judice,* in which the standard employed by the BJA for determining whether Officer Demutiis was covered by the PSOBA derives from an interpretation of worker's compensation law.[17] Accordingly, the hear-

---

15. *See* H.R. Conf. Rep. No. 94–1501, at 6 (1976) (concluding that "line of duty" is a "well established concept"); S.Rep. No. 94–816, at 6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2504, 2507 ("The term 'line of duty' as used in this bill has the customary usage . . ."); 122 Cong. Rec. 22634–55 (1976) (statement of Sen. McClellan) (same); 122 Cong. Rec. 30518–23 (1976) (statement of Rep. Eilberg) ("concept of line of duty is well defined"). The Congressional hearings that preceded the PSOBA leave little doubt as to what Congress had in mind in making these statements as they are replete with references to, and detailed studies of, then existing worker's compensation and police/firemen death benefit programs, many of which relied upon "line of duty" determinations. *See, e.g., Public Safety Officers' Benefits Act: Hearings on S. 1527 and S. 2575 Before the Senate Comm. on the Judiciary, Subcomm. on Criminal Laws and Procedures,* 94th Cong. 82 (1976) (study of state and local lump sum cash payments for line of duty violent death); *Public Safety Officers Benefits Act: Hearings on H.R. 365, H.R. 366, and H.R. 3544 Before the Subcomm. on Immigration, Citizenship and International Law of the House Comm. on the Judiciary,* 94th Cong. 76 (referring to worker's compensation law), 92–95 (death benefits study), 130 (analysis of worker's compensation laws), 171 (pension profile) (1975); *Public Safety Officers' Benefits Act—Law Enforcement Officers' Bill of Rights: Hearings on H.R. 12, S. 15, H.R. 163, H.R. 4598, and H.R. 6449 Before the Subcomm. on Immigration, Citizenship and International Law of the House Comm. on the Judiciary,* 93d Cong. 48 (referring to worker's compensation law), 171–78 (study of worker's compensation laws) (1973).

16. In *Yanco v. United States,* 45 Fed.Cl. 782 (2000), Senior Judge Lydon concluded that it was questionable whether *Harold* survived the Supreme Court's intervening decision in *Chevron, supra. Id.* at 791–92. Essentially, he reasoned that *Chevron* deference to the BJA's views trumped the Court of Claims' view that worker's compensation law was relevant in determining eligibility under the PSOBA. *See id.* With all due respect to this distinguished jurist, the court disagrees with this conclusion for at least two reasons. First, the conclusion that worker's compensation law is relevant derives principally from the legislative history of the PSOBA, thereby precluding the agency from taking a contrary view. *See Harold,* 634 F.2d at 550–51 and *supra* note 15. Second, the *Harold* court undoubtedly was sensitive to the concept of agency deference as that concept predated *Chevron. See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Accordingly, in this court's view, *Chevron* provides no basis for deviating from what otherwise is clearly binding precedent.

17. In determining whether an off-duty officer on the way to work is eligible for benefits, the BJA applies a three-pronged test it claims was established in *Russell,* 637 F.2d at 1265. The BJA test provides that a police officer who is coming or going from work is not covered by the PSOBA, unless he is: (1) driving his employer's vehicle; (2) responding to a specific emergency, or (3) required by his employer to use his personal vehicle at work. In fact, the Ninth Circuit did not adopt this formulation, but instead enunciated a "nexus" test that was based upon its review of worker's compensation case law. Specifically,

ing officer should have attached some weight to the conclusions reached by the New York City and State authorities in this case. What weight should be given to these conclusions is a matter, in the first instance, for the hearing officer to determine. However, that determination should not be based upon mere speculation that the standards employed by these authorities "may" be different than those applied under PSOBA—as the hearing officer indicated in holding those conclusions irrelevant—but rather upon an actual analysis of how state and local law compares to the Federal standard, particularly in terms of their respective definitions of "line of duty."

Accordingly, on remand, the agency should ensure that the findings of the local and state investigators are given substantial weight and that appropriate weight is given to the conclusions reached by the affected New York city and state agencies.

### 3. Was the Hearing Conducted in a Manner as to Best Ascertain the Rights of the Claimant?

BJA's regulations are remarkable in the degree to which they require a hearing officer to act affirmatively in ascertaining a claimant's eligibility. Thus, for example, they provide that "[i]n conducting the hearing, the hearing officer shall not be bound by common law or statutory rules of evidence, by technical or formal rules of procedure, or

by chapter 5 of the Administrative Procedure Act . . ., but must conduct the hearing in such manner as to best ascertain the rights of the claimant." 28 C.F.R. § 32.24(c). In addition, the regulation states that, at such a hearing, the hearing officer is not limited to the evidence introduced by the claimant, but "shall, in addition, receive such other evidence as the hearing officer may determine to be necessary or useful in evaluating the claim." *Id.* Consistent with these responsibilities, the hearing officer is authorized to "[i]ssue subpoenas" and to "[r]eceive evidence at any place in the United States." *Id.* at § 32.24(d)(1), (4). Moreover, "[i]f the hearing officer believes that there is relevant and material evidence available which has not been presented at the hearing, the hearing officer may adjourn the hearing and, at any time prior to mailing the decision, reopen the hearing for the receipt of such evidence." *Id.* at § 32.24(e).

These regulations demonstrate that a hearing officer handling a PSOBA claim is not merely an umpire blandly calling balls and strikes, nor certainly a pedantic advocate for the agency's preliminary decision, but rather a dispenser of justice, with an active and affirmative responsibility to develop the record and thereby "best ascertain the rights of the claimant." [18] 28 C.F.R. § 32.24(c). Plaintiff contends, and this court finds, that in the instant case the hearing officer did not meet this important responsibility. Rather,

---

the court relied on a 1975 Michigan authority for the proposition that the "going and coming rule" had become "riddled with exceptions" and "has evolved into a new rule which compensates injury where there is a sufficient nexus between the employment and the injury to conclude that it was a circumstance of employment." *Id.* at 1265 (internal quotations omitted). The court held that this "workers' compensation standard is the more apt guide for measuring job-relatedness under the [PSOBA]," finding that Congress was alluding to worker's compensation law in employing the "line of duty" concept and that worker's compensation laws and the PSOBA "have common elements." *Id.* While the Ninth Circuit identified some of the factors listed in BJA's standard as indicating the existence of a "sufficient nexus," it never indicated that such factors were exclusive. *See Davis,* 46 Fed.Cl. at 426 n. 5. While plaintiff does not challenge the tripartite formula employed by BJA here, what is important for our purposes is that whatever stan-

dard is derivable from *Russell* is indisputably based upon worker's compensation principles.

18. The situation created by the BJA's regulations is analogous to that under the Social Security Act, under which the regulations of the Department of Health and Human Services have been construed to impose on the Department and administrative law judges an affirmative obligation to develop fully and fairly the record in a case. *See Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996); *Poulin v. Bowen,* 817 F.2d 865, 870 (D.C.Cir. 1987); *Carrillo Marin v. Secretary of HHS,* 758 F.2d 14, 16 (1st Cir.1985). *See also Echevarria v. Secretary of HHS,* 685 F.2d 751, 755 (2d Cir. 1982) ("[T]he ALJ, unlike a judge in trial, must himself affirmatively develop the record" in light of "the essentially nonadversarial nature of a benefits proceeding"). Notably, in social security cases, this obligation arises even where the claimant is represented by counsel. *See Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996)

on several critical evidentiary points, the hearing officer relied upon supposition and speculation and too readily drew adverse inferences, rather than ascertaining easily obtainable facts. Several examples bear this point out:

— First, the hearing officer relied upon "citizen eyewitness statements" in rejecting testimony by two police officers who testified that they witnessed Officer Demutiis slow down and then stop his car in an effort to obstruct the fleeing vehicle. While, as discussed below, the court does not believe that these citizen "statements" actually conflicted with the officer's testimony, they, in fact, were nothing more than snippets from summaries written by NYPD detectives of the results of interviews conducted with the witnesses. Yet, while he placed virtually conclusive weight on a few isolated words and phrases in these reports, the hearing officer made no attempt to obtain live testimony from these witnesses to explain what they actually saw, so as to ensure that their statements truly were different than those of the officers. Moreover, while questioning the credibility of the officers, the hearing officer made no attempt to obtain the written reports that the officers had earlier filed to see whether they corroborated the testimony.

— Second, the hearing officer purported to rely on various photographs in concluding that there were "structures (e.g., buildings) that would have blocked Officer Demutiis' view of the oncoming vehicle until immediately before impact, . . ., thus making it doubtful that he could see the pursuing police units." These photos were taken by the NYPD in accordance with specific instructions given by the BJA. However, as discussed further below, the photographs clearly do not provide a view of what Officer Demutiis could have seen as he proceeded into the intersection, but instead were taken from other vantage points, including the middle of the intersection of 102nd Street and Liberty Avenue. Accordingly, they provided the hearing officer with absolutely no factual basis for concluding what Officer Demutiis could or could not see as he started into the intersection, let alone what he saw as he proceeded across a six-lane avenue. Yet, the hearing officer made no attempt to conduct a site visit to determine what Officer Demutiis might actually have seen, even though the evidentiary hearing was conducted in New York City.

To be sure, if this were a simple adversarial proceeding, the hearing officer might not be expected to take the affirmative steps outlined above. But this was not such a proceeding, but rather one in which the hearing officer was charged, by agency regulations, "to conduct the hearing in such manner as to best ascertain the rights of the claimant." C.F.R. § 32.24(c). This he did not do.

■■■ Defendant argues that plaintiffs' former counsel should have responded to the hearing officer's adverse determination by supplying the agency with additional factual information. To be sure, the BJA did afford plaintiffs the opportunity to supplement the record developed by the hearing officer. But, the gravamen of plaintiffs' complaint is that the agency failed to give proper weight to the evidence actually supplied and that the hearing officer also rendered adverse findings based upon speculation—claims that this court believes are well-taken. Moreover, under the BJA regulations, the court concludes that the BJA may not weigh gaps in the record against a claimant without first making reasonable attempts to obtain available evidence, particularly where, as here, many of the alleged gaps were not apparent, *ab initio*, but were first identified in the hearing officer's determination. And this obligations exists whether or not a PSOBA claimant is represented. *See Perez*, 77 F.3d at 47; *Baker v. Bowen*, 886 F.2d 289, 292 n. 1 (10th Cir.1989) ("[T]he ALJ . . . has the affirmative duty to fully and fairly develop the record regardless of whether the applicant is represented by an attorney or a paralegal."); *Todd v. Heckler*, 736 F.2d 641, 642 (11th

Cir.1984); *Smith v. Bowen,* 687 F.Supp. 902, 906 (S.D.N.Y.1988).

\* \* \* \* \* \*

In sum, the hearing officer here, and the agency, in turn, failed to follow BJA's own regulations in denying plaintiffs' claim. The fact that BJA could doubtless have crafted regulations that did not impose these obligations upon it in considering the PSOBA claims is totally beside the point. Even assuming that such relaxed regulations would be valid, it remains that having made its regulatory bed, the BJA cannot casually sleep elsewhere. As Justice Jackson stated, albeit in dissent, in *Shaughnessy v. United States,* 345 U.S. 206, 224, 73 S.Ct. 625, 97 L.Ed. 956 (1953), "[p]rocedural fairness and regularity are of the indispensable essence of liberty."

**D. Was the Decision of the BJA Supported by Substantial Evidence?**

Standing alone, the errors identified above require a remand of this matter. But, plaintiffs also allege that the agency's determination was not supported by substantial evidence and suggest that this court should find that plaintiffs are entitled to the death benefits. This court, however, is unwilling to usurp the fact-finding responsibilities of the agency, particularly since some evidence supports the agency's determination (*i.e.,* the fact the perpetrator's car was traveling at a high rate of speed without its lights on). *See Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. Nonetheless, the court observes that the agency improperly engaged in speculation in denying plaintiffs' claim and that the evidence the agency relied upon in reaching its decision clearly did not support certain key findings. As these errors provide an independent basis for a remand, the court will review them in an effort to ensure that they are not repeated.

**1. Findings Regarding the Police Officers' Testimony.**

In his determination, the hearing officer spurned the testimony by the police witnesses, stating:

The testimony presented at the hearing by police witnesses was largely speculative in nature. The officers at the hearing provided testimony that characterized the actions of Office Demutiis based on their beliefs of what they surmised his actions to be. There was no firm, objective evidence presented—only their beliefs that his actions must have been the actions of an officer assisting fellow officers, as opposed to an individual who found himself at the wrong place at the wrong time. Testimony presented by the police officers at the hearing differs significantly from the citizen eyewitness statements taken by police at the time of the accident.

The hearing officer further concluded that "the rationale that Officer Demutiis would place his life in immediate peril by stopping his personal car in front of a vehicle fleeing police with its lights off and traveling at an extremely high rate of speed is not credible."

In analyzing these findings under the substantial evidence standard, it is important to juxtapose what the officers actually testified against what the citizen eyewitnesses reportedly stated. Regarding the accident, Officer Knapp, who was in the patrol car closest to the fleeing vehicle, testified as follows:

Q: How far were you from the vehicle you were pursuing?

A: Maybe 100 feet, 150 feet, and we approached, you know, near 100th Street or so, I guess we saw Officer Demutiis' car pull out into the intersection and stop his vehicle in the middle of the intersection and as we got up around 102nd Street the car that was fleeing from us would just—never hit the brakes or nothing, just like hit Officer Demutiis' car.

Q: You saw Officer Demutiis' car pull into the intersection?

A: Yes

Q: And stop?

A: Yes, it was at stop.

In his cross-examination, the hearing officer pressed Officer Knapp as to whether the collision was the result of a simple accident, to which Officer Knapp responded: "It's possible to get in a car accident, yes, but why would anybody stop in the intersection when

there's nothing in front of you, you know." Asked why he thought Officer Demutiis was assisting him, Officer Knapp further testified: "Only that he stopped his vehicle blocking the road."

The hearing officer also heard testimony from Officer Banks, who was Officer Knapp's partner and in the same patrol car the night of the collision. Regarding the accident, Office Banks testified:

Q: There came a time then when you picked up the chase; where did you pick up the chase, what street?

A: We observed the perpetrator traveling eastbound on Liberty and we were at Crossbay Boulevard when we saw the perpetrator go across the red light on Crossbay Boulevard . . . .

At that time we got behind the perpetrator and we were, the most, a block away, and you have to understand something, that at the time of impact a block away is not a very long distance, so we had a chance to observe Officer Demutiis pull out into the intersection and, in my opinion, when you are traveling down Liberty Avenue, even if you don't see the lights coming, you have an enclosed area of buildings, you're going to hear that siren. There is no question in my mind that Officer Demutiis heard the sirens coming. Officer Demutiis pulled out into the intersection. He had a chance to escape that intersection, he had time to pull away from that vehicle, and Office Demutiis did not do that. He remained in the intersection and, in my opinion, attempted to help us in some way."

. . . .

Q: Officer Banks, in point of distance, how far were you from Officer Demutiis' car, whoever it was, when you first observed it?

A: Well, when we first observed his car, he was approximately 100 feet away from the perpetrator's car and maybe 150 feet away from us. As we approached, he just slowed down and came to a stop and we just watched the car go right into the—I'd also like to point out that the perpetrator could

have avoided that accident, and I put the blame on the perpetrator for ramming into the side of his car, because by all means the perpetrator could have decelerated and hit the brakes and steered either right or left and avoided that collision.

. . . .

Q: His car came to a halt in the same lane of travel that you were driving in?

A: Basically right in the middle of the intersection, he came to a halt and, you know, he creeped out slow to see what was going on and he saw that we were in pursuit and he came to a stop and, as I said, I didn't even know it was Nick until five minutes after the collision and I remember thinking to myself I got to help this poor guy, he tried to help us, and that's basically it.

At several other points in his testimony, Officer Banks reiterated his view that Officer Demutiis purposely blocked the intersection, stating "they definitely had an escape route. All he had to do is step on the accelerator and he could have easily avoided this accident," and later again, "[h]e would have had an escape exit."

As noted above, the hearing officer rejected this testimony, finding that it did not constitute "firm, objective evidence" and that it "differ[ed] significantly from the citizen eyewitness statements taken by police at the time of the accident." The portions of the citizen eyewitness statements on which the hearing officer apparently relied in making this finding are conspicuously brief, amounting to a single word in two of the reports and a short phrase in another, to wit:

— Aimee Henkell was reported to have been standing a block away from the accident at 103rd Street and Liberty Avenue. On her interview form, in response to a pre-printed question regarding "speed of vehicle involved," she reportedly answered that Officer Demutiis' vehicle was going "slow."

— Anthony Maggiore was reported to have been also approximately at the corner of 103rd Street and Liberty

Avenue. In response to the same pre-printed question regarding the speed of Officer Demutiis' vehicle, Mr. Maggiore reportedly answered "slow."

— Kathleen Carvotta was reported to have been essentially on the same corner as the other two witnesses. Summarizing the results of her interview, the detective reported that "[s]he then saw a beige auto comeing [sic] out of 102 St. He was not going fast."

Thus, the hearing officer apparently rejected the testimony of two police officers that Officer Demutiis had entered the intersection slowly and stopped, because the citizens' reports indicated that he was going just "slow" and "not going fast." And, again, the hearing officer arrived at this critical finding— essentially the heart of his determination— while seeking no clarification from the citizen witnesses.

▆▆▆ It is beyond peradventure that the hearing officer was authorized to evaluate the credibility of the police witnesses. But, while credibility findings made by a hearing officer and adopted by an agency are ordinarily accorded great weight by a reviewing court, the weight given is less where, as here, the finding is based not on the demeanor of a witness, but rather on the purported existence of contradictory evidence, particularly where the alleged contradictory evidence is documentary in nature. *See Sioux Products, Inc. v. NLRB,* 684 F.2d 1251, 1253–54 (7th Cir.1982). All findings of fact, including those based on credibility, must be supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *W.F. Bolin Co. v. NLRB,* 70 F.3d 863, 870 (6th Cir.1995); *Weather Shield Mfg., Inc., v. NLRB,* 890 F.2d 52, 57 (7th Cir.1989). Plaintiffs contend that findings contrary to direct, positive testimony cannot meet this standard. However, the presence of such testimony does not preclude a hearing officer from finding that testimony not credible, and, therefore, insufficient to sustain the burden.

*See NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 407–08, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); *Glomac Plastics, Inc. v. NLRB,* 592 F.2d 94, 99 (2d Cir.1979). Such a finding may be upheld if the hearing officer provides good reasons for rejecting the testimony and fully explains those reasons in light of the evidence. *See K–Mart Corp. v. NLRB,* 62 F.3d 209, 212 (7th Cir.1995); *NLRB v. Cutting, Inc.,* 701 F.2d 659, 663 (7th Cir.1983); *White Glove Bldg. Maint., Inc. v. Brennan,* 518 F.2d 1271, 1273–74 (9th Cir.1975). Conversely, these authorities make clear that an agency may not support its decision by simply jettisoning all the contrary evidence on the record based upon unexplained (and somewhat expedient) credibility findings. *See Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. 456 ("The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.")

▆▆▆ Here, however, not only did the hearing officer fail to explain fully his credibility findings, but the evidence itself does not appear to contradict the police officers' testimony to any significant degree.[19] Indeed, the slight variances between the testimony and the reports could easily derive from the witnesses' vantage points—and the record indicates that the officers were closer to the accident scene. More importantly, without further evidence, it is unclear what the citizens meant when they apparently answered standard form questions posed to them by stating that Officer Demutiis was going "slow" or "not going fast." Certainly, their brief comments do not leave the impression that Officer Demutiis proceeded through the intersection at a normal pace— leaving open the possibility that he was aware of the police emergency or at least was attempting to ascertain the nature of the emergency. At all events, the hearing officer's conclusion that the police officers did not provide firm, objective evidence, but rather only speculation, is clearly rebutted by the testimony quoted above, which emphasizes repeatedly that Officer Demutiis stopped in the intersection and could have

---

**19.** The hearing officer preliminarily reached this same conclusion. Thus, in responding to a comment from plaintiffs' counsel regarding the police and the citizens' statements, the hearing officer stated: "I don't interpret their statements as conflicting. Basically what they said is pretty much the same."

accelerated to avoid the accident. In these circumstances, the hearing officer's findings discounting the police testimony are not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). *See also Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988) ("Minor inconsistencies in the record . . . are not an adequate basis for an adverse credibility finding").[20]

On remand, the BJA may be in a position to develop further evidence and to determine whether that evidence supports or refutes the hearing officer's prior findings.

## 2. Findings Regarding Officer Demutiis' Perception of the Oncoming Cars

The hearing officer also adopted the agency's initial determination that:

> Photographs of the intersection show structures (e.g., buildings) that would have blocked Officer Demutiis' view of the oncoming vehicle until immediately before the impact, not giving him time to react or to attempt to assist pursuing police vehicles that were one block behind the fleeing vehicle at the time it struck Officer Demutiis, thus making it doubtful that he could see the pursuing police units.

This finding also is not supported by substantial evidence. Several reasons lead to this conclusion.

As previously stated, the pictures do not provide a view of what Officer Demutiis could have seen as he sat at the light and then proceeded into the intersection, but were instead taken from other vantage points. For example, one picture was taken in the middle of 102nd Street facing the direction Officer Demutiis was heading before the accident, but from approximately 100 feet back from the corner, thereby not revealing what Officer Demutiis could have seen sitting at the light. Other photos were taken in the middle of the intersection of 102nd Street and Liberty Avenue. These pictures, in fact, provide an unobstructed view down Liberty Avenue, but provide absolutely no basis for concluding what Officer Demutiis saw as he started into the intersection, let alone what he saw as he proceeded along various points across a six-lane avenue. Accordingly, the hearing officer could not have adopted the agency's findings based upon these photographs without engaging in rank speculation. This is all the more true given Officer Corrente's uncontroverted testimony that the pictures were misleading, stating, at one point, "[t]his picture here is a little—how can I say it? This building line here is actually set back. You can't really tell because of this car that's here, but it's set back, but as you're right here at the walk line, you can actually see. You have a clear view." Finally, the hearing officer did not discuss, and apparently disregarded or discounted, testimony from the police officers indicating that both pursuing patrol cars had their flashing lights on and one of them had its siren blaring. These circumstances, of course, make it much more likely that Officer Demutiis would have noticed the fleeing car and the pursuing police units before reaching the middle of the intersection.

Accordingly, the court finds that, in its current state, the record does not provide substantial evidence for a finding that Officer Demutiis could not see the oncoming vehicles. On remand, further evidence should also be developed on this point.

## III. Conclusion

Mindful of the limitations on this court's review, the court, nonetheless, is obliged to conclude that the agency's determination is, in some respects, contrary to law, and, in others, not supported by substantial evidence. In such circumstances, the Supreme Court has instructed that "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court

---

**20.** The hearing officer's comments at the hearing hint that he may have disregarded the police officers' testimony because he felt that they were attempting, by their testimony, to assist the widow and child of a fellow officer. To say the least, however, it would seem inappropriate to have a hearing officer discount the testimony of police officers simply because they were police officers, particularly in the context of the PSOBA program.

simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

Accordingly, pursuant to 28 U.S.C. § 1491(a)(2) and RCFC 60.1(a), this matter is hereby remanded to the BJA for further proceedings leading to a redetermination of plaintiffs' eligibility for compensation under the PSOBA and its implementing regulations, consistent with this opinion. The BJA shall file a written document incorporating its redetermination of plaintiffs' eligibility with this court on or before April 16, 2001, fully explaining the factual and legal basis for the redetermination. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (agency decision must set forth its rationale with clarity, and must be justifiable on that basis). Defendant shall file status reports indicating the progress of the remand on the following dates: December 20, 2000 and February 16, 2001.

**IT IS SO ORDERED.**